G-holson, J.
The constitution of 1802 contained the following; provision as to the persons entitled to the exercise of the elective franchise; “ In all elections, all white male inhabitants above the age of twenty-one years, having resided in the state one year next preceding the election, and who have jiaid or are charged with a state- or county tax, shall enjoy the right of an elector; but no person shall be entitled to vote, except in the county or district in which he shall actually reside at the time of the election.” Art. 4, sec. 1. The use of the word “ white,” in this section, necessarily excluded those inhabitants of the state, though otherwise qualified, who were not white, and called for a determination of the question, who should be deemed “ white,” within the meaning of the constitution ? This question was answered by repeated judicial decisions. It was-considered in view of blood or race, and the rule adopted to meet, the obvious difficulty *of a mixture of blood or races, was that the white race must predominate. There was a white race and a black race, and the obvious intent was, to exclude the latter from the elective franchise. If an inhabitant of the state had an equal portion of the blood of each race, the exclusion still applied but if he had a larger proportion of the blood of the white race, he-was to be regarded as white, within the meaning of the constitution. Polly Gray v. The State, 4 Ohio, 353; Williams v. School Directors, Wright, 579; Jeffries v. Ankeny, 11 Ohio, 372; Thacker v. Hawk, 11 Ohio, 376; Chalmers v. Stewart, 11 Ohio, 386; Lane v. Baker, 12 Ohio, 237; Stewart v. Southard, 17 Ohio, 402.
There was, probably, no word in the constitution of 1802, the-meaning of which had been more fully and authoritatively settled, by judicial construction, than the word “ white,” as connected with the exorcise of the elective franchise. And, undoubtedly, at the time of the adoption of the constitution of 1851, persons coming; *460 within the description above stated, in whom the blood of the white race predominated, and who were in other respects qualified, had a right to the exercise of the elective franchise. The first section of the fifth article of that constitution provides that: “ Every white male citizen of the United States, of the age of twenty-one years, who shall have been a resident of the state for one year next preceding the election, and of the county, township, or ward in which he resides, such time as may be provided by law, shall have the qualifications of an elector, and be entitled to vote at all elections.” And the question presented in this case is, whether it was the intention -of that section to deprive the persons above described of a right which they had before enjoyed — and of a right so valuable and highly prized as that of an elector ?
In any ordinary case — in any case in which feeling and prejudice ■did not enter as elements to disturb the judgment — no one would probably claim that a most important *right once enjoyed, and, necessarily, in its nature continuous, was abrogated and annulled, unless the intent to do so was clearly and explicitly expressed. Argument and inference from the use of doubtful and indefinite terms, would not be deemed sufficient. We trust that, without influence from any prejudice we might personally feel, or from any which we might suppose to be felt by others, we can, in the language of our official oath, administer justice without respect to persons. And, regarding this as a case to be governed by the ■ordinary rules of construction, we might safely stop, by adopting the language of a distinguished and lamented judge, expressed while acting as a member of the convention which framed the present constitution, and say of the section of it under consideration, that it is substantially the same as the corresponding provision of the old constitution.” Mr. Hitchcock, of Geauga, 2 Debates ■of Convention, 639, 640.
But the interest and importance of the question demand from us further remarks. We are bound to presume, that those who framed the present constitution knew what judicial construction the words of !he former had received. If we look at the record of their proceedings, published under their authority, we know as a fact that the construcción which had been given to the word “white,” was expressly and directly brought to their attention. A proposition was made to strike out the word, so as to remove the exclusion of persons not white, and it was contended “ that the term ‘ white ’ is *461 vague in its signification and has no practical meaning.” In answer, it was said: “Such might have been the case, if the word had not received a practical construction for near fifty years; but there is now no question that may with more safety be submitted to any of our tribunals, from the Supreme Court to the justice of the peace.” Mr. Worthington, 2 Debates in Convention, 639. And a member in favor of the proposition, commenting. on the decision of the courts as one they had been obliged to make to get over the ^difficulty from the use of the word “white,” expressly stated that decision to be, “that a person having less than half black blood shall have the rights of a white man.” Mr. Humphreville, 2 Debates of Convention, 553. In view, then, of this knowledge, presumed and actual, of the construction the word “white” had received in reference to the exercise of the elective franchise, we find the same word in the same connection in the present constitution. By the clear and well-settled rules of construction, we are bound to conclude that the word was used in the same sense, and was intended to include all persons whom the-meaning it had received would embrace.
To induce any doubt as to the correctness of this conclusion, reference must be had to words in the context, not found in the corresponding provision of the old constitution. The only words-from which any such doubts can possibly arise, are “ citizens of the United States,” substituted for the word “inhabitants,” used in the former provision. And we do not suppose that this donbt was ever-entertained, until after a recent decision of the Supreme Court of the United States. Dred Scott v. Sandford, 19 How. 393. But it is a mistake to suppose that the question, whether any degree of the blood of the African race would prevent a person from being a citizen of the United States, was presented or decided in that case. On the contrary, the plaintiff in that case was alleged, in the plea in abatement, to be “ a negro of African descent, whose ancestors were of pure African blood, and who were brought to this country and sold as slaves.” 19 Howard, 400. And it was said by Taneyr C. J., in the opinion 6f the court: “ The question is simply this: Can a negro, whose ancestors were imported into this country and sold as slaves, become a member of the political community formed and brought into existence by the constitution of the United States, and as such become entitled to all the rights, and privileges, and immunities guaranteed by thát instrument to the citizen ? One of which- *462 *rights is the privilege of suing in a court of the United States in the cases specified in the constitution. It will be observed, that the plea applies to that class of persons whose ancestors were negroes •of the African race, and imported into this country and sold and held as slaves. The only matter in issue before the court, therefore, is whether the descendants of such slaves, when they shall be eman-cipated, or who are born of parents who had become free before their birth, are citizens of a state in the sense in which the word -citizen is used in the constitution of the United States. And this being the only matter in dispute on the pleadings, the court must be understood as speaking, in this opinion, of that class only; that is, of those persons who are the descendants of Africans who were imported into this country and sold as slaves.” 19 Howard, 403.
Indeed, it is not probable that the Supreme Court of the United •States would have announced a rule excluding persons, having any mixture of the blood of the African race, from the rights of citizenship, without reference to the constitutional and legal provisions "then and now in force in many of the states, having a strong bearing upon the question, and upon the effect of such a rule.
In North Carolina, where, before the adoption, in 1835, of amendments to the constitution of the state, it is well known that free 'blacks and mulattoes, under the general designation of free men, had the right of suffrage. The change then made is in these words : “No free negro, free mulatto, or free person of mixed blood, descended from negro ancestors to the fourth generation inclusive (though one ancestor of each generation may have been a white person), shall vote for members of the senate or house of commons.” Rev. Code, N. C. 23.
The first section of the fourth article of the constitution of Tennessee provides that: “ Every free white man, of the age of twenty-one years, being a citizen of the United States and a citizen of the county wherein he may offer his vote, *six months next pre-ceding the day of election, shall be entitled to vote for members of the general assembly and other civil officers for the county or district in which he resides: Provided, that no person shall be disqualified from voting in any election on account of color, who is now by the laws of this state a competent witness in a court of justice against a white man.” The rule as to the exclusion of witnesses is thus stated in the code of Tennessee : “A negro, mulatto, Indian, «or person of mixed blood, descended from negro or Indian ances *463 tors, to the third generation inclusive, though one ancestor of each .generation may have been a white person, whether bond or free, is incapable of being a witness in any cause, civil or criminal, except for or against each other.” Section 3808.
It is well known that in some of the states there are three classes of persons — -white citizens, slaves, and free negroes and mulattoes, as they are usually designated. To this third class another designation, mustizoes, has been added, and with this addition, it was said, in South Carolina, that “ the law recognizes only three classes of persons; freemen under the constitution, or citizens; slaves and free negroes, mulattoes and mustizoes, who constitute the third class.” "White v. Tax Collector, 3 Rich. 136-139. Now, it is evident that, to determine whether a person belongs to this third class, cither some rule must be adopted, or it must be loft to the uncertain and, to a great extent, arbitrary discretion of those called on to act in particular cases. In most of the states, whose laws or decisions we have been able to examine, a definite rule, founded upon the degree or quantity of the blood of the excluded class, has been adopted. In Yirginia, the designation is “ free negroes and mulattoos,” and the term is defined by statute : “ Every person who has one-fourth part or more of negro blood, shall be deemed a mulatto; and the word negro in any other section of this, or in any other statute, shall be construed to mean mulatto as well as negro.” Code of Yirginia, c. 103, sec. 3. There is a ^definition almost in the same words, in the statutes of Kentucky (2 Revised Statutes of Kentucky, 359); of Arkansas’ (Revised Statutes of Arkansas, 584) ; of Florida (Thompson’s Dig. 537)..
The constitution of Georgia provides that the electors of the general assembly shall be citizens of the state. A statute of the state provides a somewhat singular mode by which citizenship is to be determined. Any free white citizen is allowed to file a petition in court, as in a suit of a civil nature, against any person who may claim to exercise the rights and privileges of a free white citizen of the state, in which he shall allege that the person so claiming is of mixed blood, and not a free white person. After provisions made for process, trial, and judgment, two concurring verdicts being required, it is provided that “it shall be lawful for the plaintiff to prove that the defendant is descended from, and stands in the third generation to him or her who was or is not a free white citizen of the state, or of any other state whose constitution and laws tolérate *464 involuntary servitude, or that said defendant has one-eighth of negro or African blood in his or her veins.” T. R. R. Cobb’s New Dig. 531. And as a result of this statute, it is said in Bryan v. Walton, 20 Ga. 479-512, of a person having less than one-eighth of African blood, that “ he may exercise the rights and privileges of a freeman.”
It has been said that “those least disposed to consider persons tO' bo white who have any proportion of African blood, have admitted that persons possessing only one-eighth part of such blood should bo regarded as white.” Bailey v. Fiske, 34 Maine, 77, 78; 2 Kent’s. Com. 36, note, 7 ed. The prevalent disposition appears to be that some degree of blood affords the most satisfactory rule; but in South Carolina a different rule prevails. No rule as to degree of blood has been prescribed by statute or settled by decision, and there appears to bo a difference *of opinion as to the propriety of such a rule. In the first case in which the question arose,, reference was made to the law of Louisiana and the Code Noir of France for her colonies, as providing that “the descendant of a white and a quadroon, or a person having only one-eighth part of negro blood, is accounted white.” And it is added: “Pci’kajjs it would be desirable the legislature should adopt some such uniform rule hero.” State v. Davis, 2 Bailey, 558-560. But in a subsequent case it is said: “ It would be difficult, if not impolitic, to define by precise and inflexible rules the line of separation between the two classes.” White v. Tax Collector, 3 Rich. 136-139. The decisions in the state show that no rule has remained fixed. In the case of The State v. Davis, the rule stated was “that where there is a distinct and visible admixture of negro blood, the person is to be denominated a mulatto or a person of color.” 2 Bailey, 558, 559. But in the case of the State v. Canty, it was said: “ The condition of the individual is not to be determined solely by the distinct and visible mixture of negro blood, but by reputation, by his reception into society, and his having commonly exercised the privileges of a white man.” 2 Hill, S. C. 614-616. And it is said that it must bo “regarded as settled, that it is not every admixture of negro blood, however slight and remote, that will make a person of color, within the meaning of the law.” Id. 616; White v. Tax Collector, 3 Rich. 136-140.
But it is useless to multiply instances or authorities. We do not think one can be found which will countenance the idea that any *465 the least admixture of African blood will preclude a person from being considered a citizen of the United States. Of course we can not conjecture, and it is a matter with which we are not properly concerned, what rule upon the subject the courts of the United States may think proper to adopt in cases which may hereafter present the question for their determination. ¥e feel entirely clear that no restriction or limitation *upon the meaning of the term “ citizen of the United States,” supposed to result froiñ the decision which has been recently made by the Supreme Court of the United States, or from any which may be made, can affect its meaning as used in our constitution.
There can be no doubt that those who framed our constitution, had the power to confer the right of suffrage upon any class or description of persons. This is nowhere more fully and clearly admitted than in the case of Dred Scott v. Sandford, 19 How. 408.
If we were satisfied that the framers of the constitution intended to confer the right of suffrage upon a particular description of persons, and, in doing so, used a phrase in a sense wlíich, as then understood, was sufficient for the purpose, and which is shown to be a mistaken one only by subsequent research and newer light, we would still be bound to give effect to the sense in which the phrase was used. The question is not, what the phrase “ citizen of the United States ” means in the light of the decision in the case of Dred Scott v. Sandford, but what the framers of our constitution intended by the use of that phrase, and what, in the connection in which it is found, and with the light and knowledge possessed when it was used, it was intended to mean.
We think it entirely clear, that the phrase “ citizen of the United States ” was inserted in our constitution with a view to the exclusion of aliens until they should be naturalized, and thus become citizens of the United States. We are confident that the phrase was used with no reference to color, and can not believe that the idea was then entertained that, independent of the word “white,” the phrase “ citizen of the United States” would operate to exclude any person, on account of color, from the exercise of the elective franchise. In truth, it seems too clear for argument, that, had the phrase “ citizen of the United States ” a then well-understood connotation or signification, that necessarily carried along with it the attribute of ^whiteness of color, and, much more, of the absence of any admixture whatever of blood *466 •or color, the word “ white ” would have been applied as a qualification to the phrase. “White male citizen of the United States” is the language. Now, if a citizen of the United States must ■necessarily be, and can only be, a white person, why say white •citizen of the United States? The very use of the term “white,” ■as applied to a citizen of the United States, necessarily implies that those who used it, supposed and understood that there might be citizens of the United States who were not white.
It so happens, that we are not left merely to presumption that the phrase “ citizen of the United States ” was used by the framers of the constitution in a general sense. A motion was made in the convention, to strike out from the section under consideration the words “United States,” aud insert “this state;” and, singularly enough, the danger of using an expression, the meaning of which might be altered or controlled by an authority independent of the state, suggested itself to a member, and was expressed. Mr. Heemelin, 2 Debates of Convention, 9. But in answer, it was said: “ Who shall be considered citizens of this Union ? I take the broad but tenable ground, that all should be regarded as citizens of the United States who owe allegiance to the government of the Union, whether they are vested with the elective franchise or not.” Mr. Taylor, Id. 9. “ American citizenship is a generic and comprehensive term, and much more so than the term ‘ subject,’ under a monarchical form of government. The term ‘ a citizen of the United States,’ therefore, includes men, women, and children' — every one, in short, who can demand the official protection of the federal government, or may be amenable for the ■crime of treason.” Mr. President Medill, Id. 9.
We are aware that the general assembly of the state, by an act passed April 2, 1859, has expressed a view of the meaning of the word “ white,” in the section of the ^constitution regulating •the elective franchise, in conflict with that which we have stated to be the one intended. There are cases in which subsequent legislation may be properly looked to, as reflecting light on the construction of former laws, though it would not furnish a rule obligatory upon the courts. There are cases involving this very question of color, in which legislative intent would properly be our guide. Such was the case as to the classification of youth entitled to the benefit of the public schools, in which the majority of this court held, that the legislature had expressed an intention that a *467 classification should be made, founded as well upon the visible admixture of color and upon social intercourse, as upon the degree of the blood of the African race. Van Camp v. The Board of Education of Logan, ante, 406. But, surely, it can not be claimed, and will not, at this day, be claimed by any intelligent statesman or lawyer; that it is within the scope of legislative power to give to the courts an authoritative construction of a provision of the constitution of the state. The simple question with us is, in what sense the word “ white ” was used in the constitution, and that sense, when ascertained, we suppose to be obligatory both upon us and the general assembly of the state.
The word, we have shown, had received, at the time of the adoption of the present constitution, a clear and settled construction. Doubtless, this construction may not have been satisfactory to many persons; but the time and the opportunity to have expressed dissatisfaction, were during the deliberations of the convention. It was entirely competent for the convention to change the construction which the courts had given, and, we can not doubt, had a change been desired or intended, it would have been made.
In this view, it is obvious that it would be a grave error to suppose that the judges of this court, whatever might be their individual views, have the same right to re-examine the construction given to the word “ white,” as ^judges sitting under the old •constitution. Indeed, a settled construction, acted upon and acquiesced in for a series of years, is usually obligatory upon judges, whatever doubts they may have of its correctness. But whenever that construction has been acted upon in the framing of laws, and, much more, in the framing of a constitution, to attempt a change might well be regarded a more arbitrary exercise of power, and beyond any legitimate authority of judges.
We are unanimously of the opinion, that the description of persons of which the plaintiff is one, were not deprived by the present •constitution of the right to the exercise of the elective franchise, which they enjoyed under the construction which the old constitution had received. The plaintiff, therefore, was entitled, under the constitution, to vote at the election, and was deprived of this constitutional right by the act of the defendants. He is therefore entitled to a judgment in his favor, against the defendants, under the agreed statement of facts.
*468 The judgment of the court of common pleas reversed, and judgment entered for the plaintiff.
Brinkerhoee, C. J., and Scott, Sutliee, and Peck, JJ., concurred.